JERRY KAPLAN, ESQ. Bar No. 49142
JOSEPH BENINCASA, ESQ. Bar. No. 251347
Kaplan, Kenegos and Kadin
9150 Wilshire Boulevard Suite 175
Beverly Hills, California 90212
Email: kapkenkd@pacbell.net
Telephone:(310) 859-7700
Facsimile:(310) 859-7773

Attorneys for Defendant
VARUN AGGARWAL

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA | CASE NO.        8:22-cr-00173-CJC |
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| vs. | |
| VARUN AGGARWAL, | Date:  March 7, 2024<br>Time: 11:00 a.m. |
| Defendant. | |

## I.        INTRODUCTION

The defendant, VARUN AGGARWAL, pleaded guilty to one count of Wire Fraud, in violation of 18 U.S.C. §1343 on August 21, 2023.  The government filed its Sentencing Position and recommended a two-level downward variance pursuant to 18 U.S.C. §3553(e) and U.S.S.G §5K1.1, and a low-end sentence of 27 months.  The Recommendation Letter from United States Probation, which did not know that the government was requesting an additional downward variance, recommended a below guideline sentence of 24 months.

The defendant requests a sentence of probation, or, alternatively, home detention, based on extensive mitigating factors discussed more fully herein, that include:

1.  The defendant's voluntary termination of the embezzlement scheme and his attempt to

1

repay the monies to his employer;

2. The overstated loss amount used to determine defendant's guideline range, since most of the "losses" attributed to the defendant were for services actually provided;

3. The defendant's immediate admission of guilt and his cooperation with the government and the SEC regarding potential criminal acts to which he was a witness;

4. The defendant's "above and beyond" rehabilitative efforts and treatment from gambling and alcohol addiction, which were the source of the criminal conduct. These include several weekly 12-step meetings and service, individual therapies, and the completion of a 16-session treatment program for gambling disorders from the State of California.

5. The defendant's volunteer work since November 2022, which includes over 800 hours of service to the Mandir Hindu Temple and with the Prison Professors Charitable Corporation, and the defendant's extensive service in Alcoholics Anonymous and Gamblers Anonymous. The defendant volunteers at least 12 hours every week;

6. The defendant's responsibilities to his family, including supporting his two disabled parents, his uncle with Parkinson's disease, and his wife and two children, one of whom has autism spectrum disorder;

7. The defendant's continued employment and weekly savings to pay restitution;

8. The defendant's continued training and education, and creation of a consulting business;

9. The defendant's release plan and personal statement to the court, which shows his genuine remorse and dedication to his rehabilitation;

10. The defendant's medical conditions, which include anxiety disorder with panic attacks, hearing loss in both ears that require hearing aids, and chronic sinus infections;

11. The numerous letters to the court from family, friends, employers, clergy, and therapists

showing his excellent character and dedication to making amends for his criminal

conduct; and

12. Research showing the danger of incarcerating individuals with gambling addiction,

including the "Gambling and Crime Among Arrestees: Exploring the Link" from the U.S.

Department of Justice, National Institute of Justice, which highlights the exacerbating

effect of the corrections setting on gambling addicts.

## II.     FACTS

**A.     Personal History**

The defendant is a 42-year old naturalized U.S. citizen from India.  When he was 8 years

old, his father was kidnapped due to ongoing civil unrest between Hindus and Sikhs.  After his

father was thankfully released, the family fled to the United States to live with Mr. Aggarwal's

uncle.  His parents worked various low wages jobs to try to support the defendant and his

younger brother.  The family struggled financially and at one point lost everything again after the

defendant's father's business failed.  As the eldest son, the defendant was culturally expected to

become the primary financial supporter of the family, and this, coupled with the constant

financial insecurity of his childhood, caused the defendant intense anxiety.  He became

obsessively driven to make enough money to support his entire family and protect them from

poverty.

The defendant began working at age 15 to help support the family, while balancing his

studies and volunteer work with Key Club and Habitat for Humanity.  After graduation, the

defendant enrolled in community college, where he maintained a 4.0 grade average, before

transferring to USC's Leventhal School of Accounting. The defendant interned with

PricewaterhouseCoopers, and due to his intelligence and work ethic, he was offered full-time employment.   He began working and lived with his parents to help support them.

During this time, the defendant began "self-medicating" his anxiety through drinking and gambling.  He also opened an online trading account and started investing over the internet.  The defendant's intelligence and developing obsession with making money made him very good at his work, but that positive "hit" from making money merely fed his developing gambling addiction.

In 2008, the defendant took a position as Head of Internal Audit with KBS Realty Advisors ("KBS"), while also continuing his work as a consultant with Conexant Systems at night for extra income.  He paid off his student debts, his parents' debts, and his brother's expenses at USC.  He also sent money to extended family members in India for medical treatments, funerals, and weddings, and to his cousins to help them get established in America. Whenever anyone in his large extended family needed financial help, they came to the defendant, which only drove him to work more and harder, and to take greater and greater investment and gambling risks.  He never said "no" to a request for help.

In 2010, the defendant married his current wife.  They have two sons, aged 9 and 5 years old, the eldest of whom has Autism.  For several years, the defendant continued working and investing as a "functional" alcoholic and gambling addict, while the pressure to provide and care for his family only grew.  His uncle developed Parkinson's Disease and the defendant is now his primary caregiver.  Both his mother and father became disabled and unable to work; his mother with scoliosis-related mobility issues and his father with pulmonary sarcoidosis and a serious knee injury.  Both of them moved in with the defendant when they became disabled and he is their primary caregiver and financial support.

While to his friends and family, the defendant maintained his appearance as the successful, intelligent, and hard-working supporter of his growing family, he hid from them his addiction to gambling and alcohol and his intense anxiety and panic attacks. He increasingly went to Las Vegas where he would spend days drinking and gambling at the casinos, constantly tracking stock prices on his phone while at the gambling table, before returning back to his multiple jobs. He made more and more risky investments and drank alcohol to control his anxiety.

Attached to this Memorandum are a selection of research materials showing the profound impact on the brain of gambling addiction, which resembles cocaine addiction on brain scans. In fact, gambling addiction is so overwhelming that the suicide rate of addicts is 20%, the highest of all addictions. "Commission of illegal activity in order to gamble or pay gambling debts" is considered a natural progression of the disorder, and nearly two-thirds of the most severe compulsive gamblers end up committing crimes, the most common of which includes embezzlement. The defendant's worsening addictions and the extreme pressure he felt to provide financially for his entire family were silently crushing him, and it was sadly predictable that eventually it would all come crashing down.

B.    **Offense Conduct**

In the early 2010's, the defendant suffered over a million dollars in losses on his risky investments. He desperately tried to find other sources of income to avoid admitting to his family what was happening or acknowledging that he couldn't support them all alone. The defendant began making extra money with referral fees from vendors he helped get approved by KBS. Although these services were actually provided and were paid at market rates, the defendant did not disclose that he was getting money back that KBS paid these vendors. In

addition, the defendant helped develop a software program that KBS utilized, and he received a portion of the proceeds from the vendor.  Again, although the services and product were actually provided, the defendant did not disclose his financial involvement and used his position with KBS to get the products and services approved.  The defendant continued adding other vendors, which he got approved, and charged them referral fees to supplement his income.

Eventually, the defendant began having vendors submit false invoices for work that had not been performed, and after being paid the vendors would pay the defendant a share of the monies.  For several years, the defendant kept up the ruse with other vendors, mixing in legitimate invoices with fake ones, and getting paid on all of them.  Overall, the defendant received approximately $2.7 Million dollars[1], of which approximately $1.5 Million was for work that had not been performed. The accounting department paid the invoices by allocating most or all of the cost to the real estate investment trusts (REITs).[2]  The defendant reported all of the income on his tax returns to the penny, and paid taxes on his illicit gains.

The defendant continued this conduct until January of 2022, when the daily panic attacks and shame finally became too much to bear.  The defendant realized he couldn't survive this way.  The defendant quit his job at KBS on February 8, 2022, the same day he took his last drink.  Shortly thereafter, he contacted an attorney and asked him to help arrange repayment to KBS for their losses.  (See Declaration of John Gibson, Exhibit 1).  Between April 8, 2022 and May 26, 2022, the attorney made contact with KBS and attempted numerous times to arrange for

---

[1] The plea agreement estimated a loss amount of approximately $2,729,717.91; however, the Presentence Report noted that the loss was actually $2,601,246.06.

[2] The REITs suffered the majority of the losses.  KBS has claimed it made all of these REITs whole and that KBS is entitled to the full amount of restitution; however, a number of these REITs closed prior to KBS becoming aware of the losses, and defendant is informed and believes that approximately $391,537.13 was not paid to these REITs by KBS and that because they have closed, restitution cannot be paid to these entities and the restitution to KBS should be reduced by this amount.

repayment; however, KBS did not respond and this criminal case was filed.  The defendant immediately admitted his guilt and entered into a plea agreement.  In addition, the defendant met with the government and the SEC to cooperate in a separate investigation regarding potential unrelated criminal conduct by KBS officials.

**C.**      **Post Arrest Rehabilitation**

It is difficult to properly express the extent to which this defendant has actively attacked his rehabilitation and faced the truth of his shortcomings straight on.  The defendant's actions since February 8, 2022, show his complete remorse and determination to make amends to those he harmed.  The defendant's attached heartfelt statement shows a keen insight into his addictions and that he is dedicated to sobriety and continued recovery.  (Exhibit 2).  Also attached are letters from his family, his 12-step sponsor, the president of his Temple, his manager at the Home Depot, and his therapists, noting that he has gone "above and beyond" in addressing his addictions and reforming his life.  (Exhibit 3). These actions include:

Seeking treatment for his addictions by going to several weekly 12-step meetings, completing the 12 steps, taking a 16-session treatment program for gambling disorders from the State of California, and seeing a regular therapist specializing in gambling addiction.  (Exhibit 4). He has been sober from alcohol for over 2 years and has not placed a bet in 15 months.  In fact, he was voted anonymously to be the meeting leader for the biggest GA meeting in Orange County at Mariners Church.  Sadly, the defendant could not take the 6-month commitment due to uncertainty with this criminal case; however, he is hopeful he will be able to accept this service commitment if this Court gives him a sentence of probation or home detention.

One month after losing his job due to his arrest in November of 2022, he started working as a Sales Associate at Home Depot.  He has won four performance awards and received two

letters from customers noting his exceptional performance.  (Exhibit 5).  He has set aside a minimum of $200 each month (but often more) to go toward restitution from his earnings.  He has continued to support his family and be the caretaker of his uncle, his two parents, and his autistic son.

He obtained a business coaching certification and six life coaching certifications and began a consulting business.  (Exhibit 6).  He has already coached fifteen clients and their reviews are extraordinary.  (Exhibit 7).  He is planning to obtain the California Peer Support Certification which will allow him to help people who struggle with addiction, mental health, and trauma.  In addition, he created a website with free articles and information to be of service to anyone looking for help with any of the above topics: www.yourguidedjourney.com.

Since 2020, he has volunteered over 1,300 hours at the Mandir Temple in Irvine, and volunteered with Prison Professors Charitable Corporation to develop a real estate course that Reaches more than 100,000 inmates. (Exhibit 8).  He continues to volunteer at least 12 hours per week, in addition to his job, consulting business, caring for his disabled family members, attending AA meetings, GA meetings, continuing education, and sessions therapists.

The attached personal statement and the defendant's release plan (Exhibit 9) show the defendant is genuine when he expresses remorse, what he has learned, and how profoundly his life has changed as result of this case.  He speaks with gratitude and relief that he was caught and finally able to let the façade of his secret life fall away.  He humbly sought spiritual guidance and wisdom from his faith, his family, his fellows, and his mental health professionals.  He is determined to make complete amends to KBS, his family, our society, and dedicate the rest of his life to not only caring for his family, but to being of service to his entire community.  He is actively helping other addicts and has experienced a true "spiritual awakening" as a result of him

8

admitting his character defects, accepting a higher power, and working the 12-steps.

### III.    GUIDELINE CALCUATION

The guideline sentence should be calculated as follows based on the plea agreement and the government's sentencing position:

| | | |
|---|---|---|
| Base Offense Level: | 7 | §2B1.1 |
| Intended Loss (more than $1,550,000) | +16 | §2B1.1(b)(1)(I) |
| Abuse of Position of Trust | +2 | §3B1.3 |
| Acceptance of Responsibility | -3 | §3E1.1(a) & (b) |
| Zero-Point Offender | -2 | §4C1.1(a) & (b) |
| Cooperation | <u>-2</u> | §5K1.1 |
| Total Offense Level: | 18 | |
| Criminal History Category: | I | |
| Sentencing Range: | 27 to 33 months | |

Prior to the government moving for a 2-level downward variance, the Presentence Recommendation Letter sought a downward departure of 9 months from the Guidelines, which would result in an 18-month recommendation with the above guideline range.  The government requests a low-end sentence of 27 months.

The defendant is requesting a sentence of probation or home detention with community service.  Application Note 10(B) to U.S.S.G. §5C1.1 offers support for such a sentence: "A departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate if the defendant received an adjustment under § 4C1.1 (Adjustment for Certain Zero-

Point Offenders) and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense."

The defendant's crime is not a crime of violence, and the current guideline range overstates the seriousness of the offense.  The loss amount of $2.7 Million does not account for the fact more than half of the loss was payment for services actually provided to KBS and fair market rates, i.e., they didn't actually lose any money in those transactions.  The crime was that the defendant was receiving "kickbacks" from the vendors for referring and approving them without reporting it to KBS.  Later, the defendant did cause fraudulent invoices to be submitted for work that was not performed.

## IV.     A SENTENCE OF IMPRISONMENT IS CONTRAINDICATED BY THE DEPARTMENT OF JUSTICE FOR GAMBLING ADDICTS

Attached to this Memorandum is a report from the United States Department of Justice, National Institute of Justice, regarding gambling addiction and criminality.  (Exhibit 10). Gambling Disorder, as recognized by the Diagnostic and Statistical Manual 5th revision (DSM-5), is a serious mental health condition that, as in Mr. Aggarwal's case, can be exacerbated by drug or alcohol abuse and makes individuals significantly more likely to engage in criminality as a result of the disastrous financial consequences of gambling.  The attached report from the USDOJ underscores the challenges faced by individuals with gambling disorders while facing boredom and isolation from their families and support networks in prison and the potential consequences: "being behind bars is likely to worsen the gambling habits of many compulsive or pathological gamblers. Although it is officially banned, gambling is difficult to control in prisons

and jails. It is a diversion from the monotony of jail. As a result, jailed arrestees and prison inmates may accrue significant gambling debts behind bars that can only be paid off by committing further crimes after their release." The lack of access to treatment for gambling disorder in such environments further compounds the problem, increasing the risk of relapse and further criminal behavior.

Also attached are selected slides from a presentation by Dr. Michelle Malkin, Director of Gambling Research & Policy Initiative and Assistant Professor at the Department of Criminal Justice and Criminology at East Carolina University, which sheds light on the neurological impact of gambling addiction and the specific challenges faced by compulsive gamblers within the criminal justice system.  (Exhibit 11).

It is imperative to acknowledge the defendant's proactive steps towards addressing his addiction. He has demonstrated unwavering commitment to his recovery journey, actively engaging in approximately 100 Alcoholics Anonymous (AA) and Gamblers Anonymous (GA) meetings since July 2023. Additionally, he successfully completed the California Department of Public Health, Office of Problem Gambling treatment program for gambling disorder called California Gambling Education and Treatment Services (CalGETS), underscoring his dedication to overcoming his gambling disorder. He diligently avails himself of therapeutic support, regularly consulting with a second therapist to address any underlying mental health concerns. His steadfast adherence to the principles of the 12-step program, coupled with the invaluable support provided by his sponsor, attests to his resolute determination to reclaim his life from the clutches of addiction.  A term of incarceration will endanger his recovery and fly directly in the face of the aims of Congress: protecting the public and deterring further criminality.

///

## V.    18 U.S.C. SECTION 3553(A) FACTORS WARRANT A SENTENCE OF HOME DETENTION OR PROBATION

Title 18 of the United States Code, section 3553(a), governs sentencing.  As the Supreme Court wrote in <u>Rita v. United States</u>, 127 S.Ct. 2456, 2462 (2007):  "That provision tells the sentencing judge to consider (1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely (a) "just punishment" (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution. The provision also tells the sentencing judge to "impose a sentence sufficient, but not greater than necessary, to comply with" the basic aims of sentencing as set out above."  [Emphasis omitted.]

It is error to presume that the guideline sentencing range is reasonable.  <u>U.S. v. Nelson</u>, 129 S.Ct. 890, 892 (2009).  The circumstances of this offense and the history and characteristics of the defendant indicate the requested sentence of probation adequately take into consideration the circumstances of the crime, including the extensive post crime rehabilitation.  There is no legitimate justification for a custodial sentence, and a sentence of incarceration will actively harm the public, the defendant's family, his community, his employer, and his clients.  Probation will be sufficient, but not greater than necessary, to satisfy the goals stated in 18 U.S.C. §3553(a).

## 1.    <u>The nature and circumstances of the offense and the history and characteristics of the defendant.</u>

The defendant has noted above the circumstances of the offense and history and characteristics of the defendant, and both point to a sentence of probation.  Defendant does not

dispute that his actions were wrongful and that he must and will pay full restitution to his prior employer for the losses he caused.  However, the crime was nonviolent and his victim was a multibillion-dollar corporation.  It certainly does not excuse the conduct, but ultimately, the greatest harm was to the defendant's family, who relied on him to support them.  He let them down and is working incredibly hard to earn back their trust and take care of them.  He has shown true remorse not simply in word, but in direct action.  He has maintained employment, volunteered, dedicated himself to his treatment and recovery, continued to set aside as much money as possible to make his victim whole, assisted his family and community, and continues to actively seek ways to improve the lives of others.  He is passionate about being of service to other addicts and using his expertise in finance to help people trying to improve their own businesses.  He has truly taken a horrible mistake and turned it into a life-altering event for the better.

The defendant committed the crime while suffering from very real and untreated mental disorders – gambling addiction, alcoholism, and anxiety.  He was under immense pressure to provide more income than was sustainable and compulsively gambling.  As noted above, his brain was literally altered by the addiction and he was compelled to continue the self-destructive behavior.  The defendant has noted how relieved he was when it finally all fell apart, and despite now facing this conviction and possible incarceration, he is genuinely grateful he got caught and was forced to face this disease.  He now just hopes to continue on this path, make amends, make his victim whole, and give back to his community so that he can help others facing the same devastating consequences of addiction.

In Gall vs. United States, 552 U.S. 38, 43-44 (2007), the United States Supreme Court upheld a sentence of 3 years' probation, well below the guideline of 30-37 months imprisonment.

on the basis of the defendant's voluntarily rehabilitation.  Gall had been trafficking narcotics but voluntarily removed himself from the conspiracy and reformed his life.  The Court found that the lower court properly relied on "the Defendant's explicit withdrawal from the conspiracy…before the filing of the Indictment, the Defendant's post-offense conduct, …the start of his own successful business, the support of family and friends, lack of criminal history, and his age at the time of the offense conduct, all warrant the sentence imposed, which was sufficient, but not greater than necessary to serve the purposes of sentencing."  Id.  The Court also noted that the sentence was not simply an act of leniency, but a substantial restriction of freedom.  Id.

"[Gall] will have to comply with strict reporting conditions along with a three-year regime of alcohol and drug testing. He will not be able to change or make decisions about significant circumstances in his life, such as where to live or work, which are prized liberty interests, without first seeking authorization from his Probation Officer or, perhaps, even the Court.  Of course, the Defendant always faces the harsh consequences that await if he violates the conditions of his probationary term." Id.

Further, the District Judge noted the reason to not send Gall to prison was that "Any term of imprisonment in this case would be counter effective by depriving society of the contributions of the Defendant who, the Court has found, understands the consequences of his criminal conduct and is doing everything in his power to forge a new life. The Defendant's post-offense conduct indicates neither that he will return to criminal behavior nor that the Defendant is a danger to society. In fact, the Defendant's post-offense conduct was not motivated by a desire to please the Court or any other governmental agency, but was the pre-Indictment product of the Defendant's own desire to lead a better life."  (Emphasis added) Id, at 44-45.

Mr. Aggarwal is similarly situated to Gall. His guideline range is slightly less than Mr.

14

Gall.  He explicitly and voluntarily removed himself from the criminal conduct, stopped

drinking, and even tried to pay back the money prior to becoming aware of the criminal

investigation or any indictment.  He started his own business, has the support of family and

friends, lacks any criminal history, and is first encountering the criminal justice system at age 42.

In fact, it is difficult not to conclude that Mr. Aggarwal's post crime good conduct vastly

outweighs Mr. Gall's self-improvement.  The defendant has volunteered for an astonishing 800

hours in the last 15 months, which is on top of the nearly 600 hours of service he performed prior

to November 2022.  He has fully immersed himself in 12-step recovery, completed the steps and

is being asked to serve as an officer of the largest GA meeting in Orange County.  This is all on

top of the fact that he cares for multiple disabled family members and has been setting aside

money each month from work to pay restitution.  He has shown incredible humility, sincerity,

and remorse.

       Finally, like in <u>Gall</u>, putting Mr. Aggarwal in prison will actually be counter-productive

by not only "depriving society of the contributions of the defendant who…understands the

consequences of his criminal conduct and is doing everything in his power to forge a new life,"

but the United States Department of Justice itself recognizes that placing a gambling addict in

prison is *more* likely to result in recidivism and endangerment of the public than keeping him on

probation.  The society, the defendant, the defendant's family, his Temple, fellow addicts, his

employer, his clients, and even the victim, KBS, will all benefit from the defendant being on

home detention or probation, where he can continue to enhance the lives of those around him

while paying back the substantial restitution obligation.

///

///

15

### 2.      The punitive, deterrent, public safety, and rehabilitative needs for the sentence imposed.

The defendant has actively performed his own rehabilitation by attending several 12-step meetings per week, doing weekly therapy, completing the 16-session gambling addiction treatment, attending Temple, volunteering at least 12 hours per week, furthering his education, starting his own business, and being of service to other addicts and inmates.   There are no public safety concerns with this defendant.  As noted above, the public is actually placed in greater danger if he is incarcerated.  The defendant has even prepared a Release Plan (attached) to keep his focus on his sobriety and making full restitution to KBS.

Nor is deterrence a justification for incarceration.  First, this defendant has shown he doesn't need deterrence – he is well on his way to a crime free life.  Second, defendant's conduct and rehabilitation demonstrate that leniency is required to make an example to others.  What message does it send if someone commits a crime, dedicates his life to making amends, recovering from addiction, making restitution, volunteering in his community – in short, doing absolutely everything possible to turn his life around – only to be placed in custody just like any other defendant who has done nothing but wait for the sentence to come down and prepare for his next heist when he gets out?  This defendant should be given probation precisely because of the impact it might have on others similarly situated.  Indeed, this defendant has already volunteered for an organization that is helping educate and rehabilitate inmates.  Leniency in this case will do more to protect the public and discourage recidivism in other inmates than any sentence of incarceration could.

The defendant does not need to be punished.  The truth is that the defendant, with the profound self-improvement he has undergone, will simply be bored in prison and unable to

continue the significant progress he has made toward making his victim whole and rebuilding his life.  The real punishment will be doled out to his family, to his Temple, to his employer and his clients, and, perhaps worst of all, to the struggling addict that might have heard his story, see his transformation, and reach out to him for guidance and support to overcome his or her addiction.  The core of 12-step recovery is service to fellow addicts.  It is why that program has been more successful than any medical interventions attempted for hundreds of years.  It is person to person connection, being with someone who has humiliated themselves and fallen from grace in the worst way, someone who understands, that allows the addict to face their own demons and find the strength to recover.  It would be a tragedy to deny Mr. Aggarwal's fellow addicts his experience, strength, and hope, when it might literally save their lives.

### 3.    The kinds of sentence available.

Mr. Aggarwal is eligible for probation, home detention, or imprisonment.  He has already shown to be completely trustworthy while on bond and there is no doubt he will show perfect compliance on probation.

### 4.    The Guidelines sentencing range.

The Sentencing Range, including the 5K1.1 consideration from the government, is 27-33 months.  As noted above, this is lesser than the range in Gall and the range calculated in the Presentence Report, from which the Probation Officer departed downward 9 months.  Also noted above, the Guideline Application Note 10(B) to §5C1.1 specifically considers that a sentence of home detention or probation may be warranted for Zero Point offenders such as Mr. Aggarwal.

### 6.    The need to avoid unwarranted sentence disparities.

According to the United States Sentencing Commission's Statistical Information Packet for the Fiscal Year 2021, in the Central District of California, courts sentenced below guidelines

in over 50% of all cases.  Taking the totality of the circumstances, it is easy to see that Mr. Aggarwal should fall into that percentage.   He has been a model pretrial defendant and shown true commitment to forging a new life.  If any defendant has received probation, Mr. Aggarwal is likewise worthy under these circumstances.

There are no co-defendants in this case.  A sentence of probation for this non-violent offense is warranted.

**7.      The need to provide restitution to any victims of the offense**.

The defendant has already forfeited two accounts, and is preparing to liquidate assets upon the Court's restitution order.  As noted, he has been setting aside money each paycheck for restitution, and if his business continues to do well, he will be able to increase the rate of restitution payments.  The need to make restitution payments supports a sentence of probation – incarceration will not only delay payments, it will significantly burden his wife to provide financial support for their disabled family members, putting the family in debt and making it that much harder to make restitution when he is released.

The defendant requests that the Court order no fine and no interest on the restitution judgment, to give the defendant the best chance to make full restitution during the probationary or supervised release period.

**VI.      REQUEST FOR PASSPORT AND OCI CARD**

Upon sentencing, the defendant respectfully requests the Court order his U.S. Passports and his Indian OCI card returned.  The OCI card in particular may be impossible to replace if it is destroyed.

## VII.    CONCLUSION

Based on the foregoing, the Court should sentence the defendant to 3 years' probation, or in the alternative, to 12 months home confinement, and a substantial community service obligation.

DATED:   February 22, 2024                    By:      /s/ Joseph Benincasa
                                                      Attorneys for Defendant
                                                      VARUN AGGARWAL