**U.S. Department of Justice**
Office of Justice Programs
*National Institute of Justice*



JULY 04

# NIJ

Research for | Practice



Gambling and Crime Among Arrestees: Exploring the Link

**U.S. Department of Justice**
**Office of Justice Programs**

810 Seventh Street N.W.

Washington, DC 20531

**John Ashcroft**
*Attorney General*

**Deborah J. Daniels**
*Assistant Attorney General*

**Sarah V. Hart**
*Director, National Institute of Justice*

This and other publications and products of the National Institute of Justice can be found at:

**National Institute of Justice**
*www.ojp.usdoj.gov/nij*

**Office of Justice Programs**
Partnerships for Safer Communities
*www.ojp.usdoj.gov*

NIJ

**JULY 04**

# Gambling and Crime Among Arrestees: Exploring the Link

This Research for Practice is based on a final report submitted to the National Institute of Justice, *Pathological Gambling in Arrestee Populations* (NCJ 196677) by Richard C. McCorkle. The final report is available electronically from the National Criminal Justice Reference Service Web site, at http://www.ncjrs. org/pdffiles1/nij/grants/ 196677.pdf.

Findings and conclusions of the research reported here are those of the author and do not reflect the official position or policies of the U.S. Department of Justice.

This research was supported by National Institute of Justice grant number 99–IJ–CX–K011 awarded to the University of Nevada, Las Vegas.

NCJ 203197

# ABOUT THIS REPORT

Is there a connection between problem gambling and crime? Do compulsive or pathological gamblers resort to criminal activity to pay their debts and finance their bets? To examine the link between problem gambling and crime, researchers interviewed arrestees in Las Vegas and Des Moines to probe their gambling behavior and its relationship to their crimes.

## What did the researchers find?

Using the Arrestee Drug Abuse Monitoring (ADAM) Program as a survey vehicle, researchers found significantly more problem gambling among arrestees than in the general population. The arrestees who were interviewed had high levels of criminal activity related to pathological gambling.

- The percentage of problem or pathological gamblers among the arrestees was three to five times higher than in the general population.

- Nearly one-third of arrestees identified as pathological gamblers admitted having committed robbery in the previous year. Approximately 13 percent had assaulted someone for money. Pathological gamblers were much more likely to have sold drugs than other arrestees.

## Limitations of the study

The study was conducted among arrestees in only two U.S. cities—Las Vegas and Des Moines. Las Vegas likely has the highest level of residents and visitors who gamble of any major U.S. city. Des Moines was chosen to represent a midsize U.S. city that had more typical levels of gambling.

## Who should read this study?

Corrections administrators, drug and gambling treatment providers, State-level government policymakers.

*Richard C. McCorkle*

# Gambling and Crime Among Arrestees: Exploring the Link



The spread of legalized gambling in the United States over the past 15 years has sparked considerable political controversy, public debate, and research (see "How Big Is Gambling?"). Many policymakers are concerned that widespread gambling, especially what social scientists call compulsive or pathological gambling, will lead to increased crime, drug and alcohol use, and other social or psychological problems. They worry that gambling and its consequences will destroy individual lives, wreck families, and weaken societal institutions. Another concern is that many compulsive or pathological gamblers will turn to drug sales or other crimes to finance their habit and pay their debts.

Unfortunately, what little we know about the social and psychological effects of gambling is derived from studies of treatment populations or the general public. To understand the relationship between gambling and crime, more needs to be known about the gambling habits of people who have been arrested and jailed or sentenced to prison. Their gambling and criminal problems may well be more chronic and severe than those of other subpopulations. And we know little about the nature and consequences of their gambling activities, or the extent to which their gambling is related to the crimes for which they have been jailed.

## Exploring the connection

To better understand and deal with the relationship between gambling and criminal activity, researchers sought to answer several questions about the arrestee subpopulation:

- How many arrestees are compulsive or pathological gamblers and how many pathological gamblers are arrested for felony and misdemeanor offenses?

- Do compulsive or pathological gamblers fit any age, gender, marital status, or other profile?

**About the Author**

Dr. Richard C. McCorkle is associate professor at the University of Nevada, Las Vegas, and chair of the criminal justice department. He was the director of the Las Vegas Arrestee Drug Abuse Monitoring (ADAM) Program.

1

- How does the criminal activity of compulsive or pathological gamblers compare with that of less serious gamblers or nongamblers?

- What proportion of crimes committed by compulsive or pathological gamblers is linked to their gambling activities?

- What proportion of compulsive or pathological gamblers uses alcohol, illegal drugs, or other substances to excess? How does that affect the nature and extent of their gambling, as well as their criminal activity?

This Research for Practice is based on a study that addressed those questions. Researchers interviewed arrestees in jail in two U.S. cities—Las Vegas, Nevada, and Des Moines, Iowa. They initially contacted 3,332 arrestees. Completed interviews and urine samples were provided by 2,307 (69 percent) of those contacted. Ninety percent of those who were interviewed and provided urine samples also answered questions that probed their gambling behavior and its relationship to their crimes. The interviews for this study were conducted between fall 1999 and winter 2001.

Las Vegas was chosen because it probably has more residents and visitors who gamble than any other major metropolitan area in the United States. If a relationship exists between gambling and crime and/or drug and alcohol use, it should be clearly recognizable in Las Vegas. Des Moines, on the other hand, represents a more typical midsize U.S. city. Both Las Vegas and Des Moines participate in the Arrestee Drug Abuse Monitoring (ADAM) Program, which was operating in 35 U.S. cities when the research was conducted. ADAM collects data that allow researchers to develop national and local profiles of drug use among people who have been arrested and jailed for whatever reason.

## Classifying gambling types

For the purpose of this study, the arrestees who were interviewed were divided into five types based on their answers to a series of questions designed to determine the nature and extent of

their gambling: nongamblers and low-risk, at-risk, problem, and compulsive or pathological gamblers. Gamblers are classified by types based on a set of 10 criteria developed by the American Psychiatric Association (APA) and published in APA's *Diagnostic and Statistical Manual (DSM–IV)*. These criteria are preoccupation (e.g., reliving past gambling experiences or planning future ventures), tolerance (needing to wager more money to generate the same "buzz"), lying, withdrawal (restless or irritable when attempting to cut down or stop gambling), escape, chasing (returning to get even for a previous day's losses), loss of control, illegal acts, risked relationships, and bailout (relying on others to provide money to relieve a desperate financial situation caused by gambling). Gamblers must meet at least five of these criteria to be classified as pathological.

The overwhelming majority of Americans fall into the nongambler or low-risk groups. Most either do not gamble at all or do not gamble seriously enough to have social, legal, or economic problems as a result of their gambling. In general, low-risk gamblers are those who meet few if any of APA's criteria.

> **HOW BIG IS GAMBLING?**
>
> There is no doubt about gambling's reach today. What once appeared to be largely confined to casinos, the quiet off-track bookie, bingo halls, and the occasional Friday night poker game has become a national pastime. By 1993, more than half of all Americans reported having gambled in a casino at least once. By 1996, Americans were wagering $47.6 billion a year—more money than movies, sporting events, theme parks, cruise ships, and the recording business generated combined. By 1997, nearly 500 gambling sites were on the Internet.
>
> The number of States with legalized gambling has mushroomed. In 1978, only two States—Nevada and New Jersey—had casinos. That number grew to 27 by 1998. Twenty-three States now have Indian-owned casinos on tribal reservations within their boundaries. Seven States now permit betting on riverboat casinos. Additionally, State-run lotteries operate in 37 States and the District of Columbia. In fact, only Hawaii and Utah have no form of legalized gambling. As States and localities seek solutions to burgeoning budget deficits, legalized gambling may become even more pervasive.

They tend to gamble for social or recreational purposes, usually betting such small amounts that they rarely suffer significant losses. Thus, they have little or no reason to turn to crime to finance their gambling.

**Defining problem gambling.** Compulsive or pathological gamblers, the subject of this study, are those who sooner or later suffer heavy losses (often $100 or more at a

3

time), borrow or steal money or write bad checks to pay gambling debts, avoid or cannot pay their nongambling bills, and lie to their families, friends, and therapists about the extent of their gambling. Not only do they lie, but compulsive or pathological gamblers often rely on others to bail them out of their gambling debts. They have risked and sometimes lost friendships, marriages, jobs, and careers because of gambling. They may have tried to curtail or stop their gambling, but failed. Although the numbers have differed over the years as research methodologies and definitions have changed, the most recent studies show that about 2.5 million Americans are pathological gamblers. Another 3 million Americans are problem gamblers. The lifetime prevalence rate for pathological and problem gambling is estimated as 1.2 percent and 1.5 percent, respectively.

**Challenging stereotypes.** Compulsive gamblers are often perceived by the public as largely middle-class men whose gambling habits lead them to steal from their families, friends, and/or employers to finance their activities. They are seen as unfortunate individuals who commit such white-collar crimes as larceny, theft, embezzlement, and fraud when their gambling losses become too great to pay through their regular sources of income. Although many compulsive or pathological gamblers fit this image, surveys of the general population paint a somewhat different picture. In fact, general surveys show that pathological gamblers are most likely to be nonwhite males, who are young, less well educated, and unmarried.

Again, although many arrestees who are compulsive or pathological gamblers fit the two images described above, the study found some differences. Unlike the general population, women arrestees are as likely to have gambling problems as men. Marital status and educational attainment also seem to make little or no difference. Arrestees start gambling at a later age than pathological gamblers in the general population, especially men. Male pathological gamblers typically begin gambling as teenagers and then slowly, often over a decade or more, develop a serious gambling habit. Women who become

compulsive or pathological gamblers generally begin gambling later than men, usually in their 20s. Once they become serious gamblers, however, women develop a dependency quickly, typically within 5 years. Both men and women arrestees who are compulsive or pathological gamblers tend to be from lower social and economic classes than those identified in general surveys, more often exhibit sociopathic traits, and frequently start as criminals and only later become gamblers.

## Odds are there's a link

As noted earlier, compulsive or pathological gamblers represent only a small percentage of the general population. Yet those who meet APA's definition for pathological gambling accounted for slightly more than 1 in 10 arrestees surveyed in Las Vegas and about 1 in 25 in Des Moines. Together, 14.5 percent of arrestees in Las Vegas and 9.2 percent of those in Des Moines were either problem or pathological gamblers—three to five times the percentage in the general population.

Perhaps more telling, more than one-third of the compulsive or pathological gamblers arrested (34.6 percent in Las Vegas and 37.5 percent in Des Moines) had been arrested on at least one felony count. Surprisingly, though, pathological gamblers were no more likely to be arrested for property or other white-collar crimes (larceny, theft, embezzlement, and fraud) than nongamblers and low-risk and at-risk gamblers. Nor were they more likely to be arrested on drug charges, including selling illegal drugs. Rather, they were most likely to be arrested for such offenses as probation or parole violations, liquor law violations, trespassing, and other public order offenses.

**Link to robbery, assault.** Still, more than 30 percent of pathological gamblers who had been arrested in Las Vegas and Des Moines reported having committed a robbery within the past year, nearly double the percentage for low-risk gamblers. Nearly one-third admitted that they had committed the robbery to pay for gambling or to pay gambling debts. In addition, about 13 percent said they had assaulted someone

to get money; one in four assaults reported by pathological gamblers was directly or indirectly related to gambling. By comparison, low-risk, at-risk, or problem gamblers reported committing gambling-related robberies infrequently.

**Drug dealing.** Although they were no more likely to have been arrested on drug charges, compulsive or pathological gamblers were significantly more likely to have sold drugs than arrestees who fit the other gambling types. More than one-third of pathological gamblers said they had sold drugs, compared to 19.2 percent of problem gamblers, 20.2 percent of at-risk gamblers, and 16.1 percent of low-risk gamblers. The differences in those numbers were even greater among gamblers who reported having sold drugs specifically to fund their gambling or pay gambling debts. One in five pathological gamblers who had been arrested admitted having sold drugs to finance their gambling, compared to 4 percent among problem gamblers and less than 2 percent among at-risk gamblers.

**Using speed.** Not surprisingly, a significant proportion of compulsive or pathological gamblers tested positive for one or more illegal drugs. Arrestees' urine samples were screened for hallucinogens such as marijuana, opiates such as heroin, cocaine, and methamphetamine ("speed"). Overall, 60 percent of arrestees interviewed in Las Vegas and 56 percent of those in Des Moines had at least one illegal drug in their urine samples. But pathological gamblers were no likelier to test positive for drugs than were other gambler types. Nor were there any significant differences in which drugs were found, with one exception. Pathological gamblers were more likely to test positive for methamphetamine, a drug taken as an "upper" to keep users alert and awake during hours- or even days-long gambling binges. Beyond drugs, nearly two-thirds of the pathological gamblers reported that they drank alcohol to the point of dependence. In fact, only 3.3 percent of all arrestees interviewed for this study who were pathological gamblers reported no drug or alcohol problems.

Again, not surprisingly, the study found a relationship between pathological gambling and crime and/or drug

and alcohol use. More than 43 percent of those interviewed who acknowledged pathological gambling and substance use also said they had committed an assault during the previous year. Nearly 40 percent had committed more than one theft in the past year, four times the number of arrestees without either a gambling or a substance use problem. Approximately 38 percent of arrestees with both gambling and substance use problems reported having sold drugs, nearly eight times the number of those with no gambling or substance use problem.

Pathological gamblers reported that, on average, they committed their first crime around age 21, developed an alcohol problem by about 23 or 24, and began to have gambling problems in their mid- to late 20s. Gambling began after the onset of criminal and substance problems, not before. Nonpathological gamblers who said they had similar substance use problems and criminal activity reported a similar average age of onset for each of those problems. Men who were pathological gamblers were more likely to have committed a serious crime at an earlier age than women who were pathological gamblers. Also, only 13 percent of pathological gamblers who admitted having a gambling problem said they sought treatment. And only 10 percent said they attended Gamblers Anonymous or similar meetings.

## Policy implications

A number of conclusions and policy recommendations can be drawn from the study findings. Arrestees who report that they are or can be defined by their responses to interviews or questionnaires as compulsive or pathological gamblers are drawn disproportionately from the social and economic fringes of society. As legalized gambling spreads to States and localities that do not now permit gambling or have it only on a small scale, these jurisdictions must prepare to deal with the social ills engendered by problem gambling.

Criminals and those who use alcohol and illegal drugs to excess appear to be at greater risk for becoming compulsive or pathological gamblers. Few are likely to receive or seek treatment for

their addictions. Gambling, especially when accompanied by substance use, is a prime motivation for many but not all of their crimes.

States and localities may identify individuals with a gambling problem by using existing psychological tests (or abbreviated versions of such tests suitable to intake interviews) to screen arrestees. Today, however, few States or localities have screening programs in detention centers, jails, or prisons. Arrestees are often booked and released shortly thereafter. If at least some arrestees with a real or potential gambling problem can be identified, they can be offered treatment. Early treatment might help reduce the number who become repeat offenders.

States and localities also may want to develop treatment programs in detention centers, jails, and/or prisons. Such programs might include group therapy sessions similar to those offered by Gamblers Anonymous. Such sessions could be incorporated into existing programs for illegal drug or alcohol use. To reduce the chances of relapses once prisoners are released, States and localities may develop referral systems that offer former arrestees and inmates the names of agencies and programs that offer continued treatment and support.

Finally, being behind bars is likely to worsen the gambling habits of many compulsive or pathological gamblers. Although it is officially banned, gambling is difficult to control in prisons and jails. It is a diversion from the monotony of jail. As a result, jailed arrestees and prison inmates may accrue significant gambling debts behind bars that can only be paid off by committing further crimes after their release. Authorities could provide increased attention to gambling behaviors in detention centers, jails, and prisons.

The National Institute of Justice is the research, development, and evaluation agency of the U.S. Department of Justice. NIJ provides objective, independent, evidence-based knowledge and tools to enhance the administration of justice and public safety.

NIJ is a component of the Office of Justice Programs, which also includes the Bureau of Justice Assistance, the Bureau of Justice Statistics, the Office of Juvenile Justice and Delinquency Prevention, and the Office for Victims of Crime.